**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBIN ALMA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 16 C 2035** |
| **v.** | ) | |
| | ) | |
| **NANCY BERRYHILL, Acting** | ) | **Magistrate Judge Susan Cox** |
| **Commissioner Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robin Alma ("Plaintiff") seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a motion for summary judgment. After careful review of the record, the Court now grants Plaintiff's motion and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on December 13, 2010, alleging that he became disabled on October 1, 2008. (R. 319). After the request was denied initially and upon reconsideration, Administrative Law Judge Jose Anglada (the "ALJ") held a hearing on August 31, 2012 at which Plaintiff and a vocational expert ("VE") testified. (R. 122-62). On October 26, 2012, the ALJ issued a written decision finding found that Plaintiff was not disabled. (R. 188-204). The Appeals Council remanded the case on February 11,

2014 and instructed the ALJ to evaluate a third-party report submitted by Plaintiff's wife, reconsider Plaintiff's residual functional capacity ("RFC") with specific references to the record, and pose more carefully-constructed hypothetical questions to the VE. (R. 210-23). The ALJ then held a supplemental hearing on September 22, 2014. (R. 43-82). Plaintiff and a VE again provided testimony. The ALJ issued a second written decision on October 31, 2014, once again finding that Plaintiff is not disabled. (R. 15-35). The Appeals Council denied review on December 30, 2015, making the ALJ's decision the Commissioner's final decision. (R. 1-5). Plaintiff now seeks judicial review of the ALJ's denial of benefits.

## FACTUAL BACKGROUND

Plaintiff was 46 years old at the time of the second administrative hearing. He last worked as the manager of a hotel food and bar service department before quitting due to his mental impairments. Plaintiff, who is obese and has a long history of alcohol and cocaine use, described his primary restrictions as severe neck pain and difficulties stemming from bipolar disorder.

### A. MEDICAL HISTORY

Plaintiff sporadically complained of spasms in his neck muscles and related pain to his treating physician Dr. Syed Akhter in 2009 and 2010. A February 23, 2012 radiology report revealed multilevel degenerative disc changes in Plaintiff's neck, including facet and uncinated arthritis. (R. 787). On July 14, 2012, an MRI of the cervical spine showed diffuse spondylosis and degenerative changes with an osteophyte complex at all levels from C2-C3 through C6-C7. (R. 789). Dr. Akhter prescribed the narcotic pain medication Vicodin and the anti-inflammatory meloxicam to

treat Plaintiff's pain.  He also recommended an orthopedic consultation, but Plaintiff reported that he could not find a specialist who would accept his Medicaid insurance. (R. 791).  The record does not reflect Plaintiff's condition from the fall of 2012 through 2013, but by January 2014 Dr. Akhter noted chronic neck pain that radiated through Plaintiff's left arm at a level of seven out of ten with medication and nine out of ten without medication.  (R. 1047).  Dr. Akhter continued to prescribe both Vicodin and meloxicam, though Vicodin was no longer covered by Plaintiff's insurance.  (R. 1046). Dr. Akhter therefore added the pain medication Norco to Plaintiff's medication regimen. (R. 1045).  By the time of Dr. Akhter's last treatment notes in March and May 2014, Plaintiff reported that his pain levels continued to be seven to eight out of ten and that he was still unable to find an orthopedic surgeon who would accept Medicaid.  (R. 1041).

The great majority of the medical record concerns Plaintiff's mental health history.  Plaintiff was admitted to St. Joseph's Hospital in February 2008 for outpatient treatment after drinking alcohol and taking cocaine for the past seven months.  (R. 437). He reported that he had been off psychiatric medication for the past two years and had been experiencing panic attacks since 2000.  After his release, Plaintiff continued to receive treatment from his primary care physician Dr. Akhter, who described "very severe" panic attacks in August 2008 and noted ongoing anxiety throughout his treatment notes. (R. 593).  Dr. Akhter treated Plaintiff with the tranquilizer Xanax, which he continued to prescribe throughout 2008.  (R. 586-96).  Despite that treatment, however, Plaintiff presented at St. Elizabeth's Hospital in September 2008 complaining that he was hearing voices and feeling depressed.  (R. 452).  He was subsequently

admitted for six days of psychiatric treatment for mood swings, hostility, and noncompliant medication management. Plaintiff was diagnosed with bipolar disorder without psychosis and alcohol abuse and was treated with Depakote, Seroquel, Ativan, Zoloft, Xanax and various non-psychotropic medications. (R. 449).

The record does not show what follow-up care Plaintiff received, but by August 2009 he began individual therapy at the Community Counseling Centers of Chicago ("Community Counseling"). His intake form reflects that Plaintiff continued to take Depakote, Seroquel, Xanax, and Zoloft. (R. 506). Psychiatrist Dr. Ahmed noted that Plaintiff was only sleeping two to three hours each night. Plaintiff received multiple treatment sessions at Community Counseling throughout late 2009, 2010, and 2011 while, at the same time, receiving treatment and prescription medications from his primary physician Dr. Akhter. An entry dated November 12, 2010 states that Plaintiff had been given Seroquel, Zoloft, and Xanax from Dr. Akhter but had discontinued treatment with Dr. Ahmad because his depression prevented Plaintiff from making his appointments. (R. 480). Plaintiff's diagnosis fluctuated throughout this period to some degree. In October 2010 it was bipolar disorder with severe psychotic features, including hearing voices, nightmares, mania, and sleep that was restricted to two to four hours each night. (R. 459-63). At other times, the diagnosis included instead a mood disorder with an unspecified psychosis and a panic disorder without agoraphobia. (R. 458). Plaintiff's psychiatric symptoms persisted even though the Community Counseling notes state that his cocaine dependence was in full remission by June 2010 and his alcohol abuse was in partial remission. (R. 458).

At some point in late 2010, Plaintiff no longer received Xanax prescriptions from Dr. Akhter and was given Klonopin instead from a different treating source. He reported that his anxiety levels increased as a result. (R. 471). By March 2011, Plaintiff reported that he was not sleeping for up to three days at a stretch and that he was again hearing voices. (R. 477). As a result, Plaintiff's counselor sent him to the emergency room for immediate psychiatric intervention. (R. 477). Plaintiff was subsequently admitted to St. Mary of Nazareth Hospital on March 16, 2011 for depression with suicidal ideation and auditory hallucinations. (R. 666). Blood tests showed no traces of alcohol or illicit drug use. (R. 666). Psychiatrist Dr. Shephali Patel diagnosed Plaintiff with bipolar disorder with severe episodes accompanied by psychosis and assigned a Global Assessment of Functioning ("GAF") score of 20 to 30. (R. 667). Plaintiff was released after five days of treatment and began to receive monthly medical consultations at Community Mental Health Services. The treatment notes from that agency contain few descriptive entries but report sleeplessness, extreme agitation, and depression that were treated with Thorazine, Klonopin, Trazedone, Abilify, and Lithium. (R. 714-25).

Plaintiff's mental health treatment in 2012 was primarily with Dr. Akhter, who continued to note depression, anxiety, and a bipolar disorder, together with medications to treat those conditions. (R. 791-801). There are no records for 2013. On January 7, 2014, however, Plaintiff was admitted to the Advocate Illinois Masonic Medical Center for suicidal thoughts, auditory hallucinations, severe depression, and poor sleep. (R. 928). He was currently taking twenty medications to treat his physical and psychiatric symptoms. (R. 869). Psychiatrist Dr. Rajeev Panguluri recommended that Plaintiff's psychotropic medications should include Abilify, Trazedone, Xanax, and Lexapro. (R.

869). Plaintiff subsequently began outpatient treatment at Advocate Illinois with psychiatrist Dr. Zachary Friedman and other treaters. Dr. Friedman noted on January 22, 2014 that Plaintiff had not slept for two days. (R. 916). Consequently, Plaintiff's medication regimen was changed by February 2014 to include Abilify, Buspar, Sertraline, Restoril, Xanax, and Trazodone. (R. 912). Despite these medications, Plaintiff had difficulty leaving his home for treatment due to ongoing anxiety. (R. 898, 904). In the last treatment note dated May 13, 2014, however, Plaintiff reported that the recent addition of the bipolar medication Latuda had reduced his mood swings and permitted him to sleep up to five hours a night. (R. 896).

## B. THE ALJ'S DECISION

Applying the familiar five-step evaluation procedure for disability cases, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 1, 2008. (R. 18). His severe impairments at step two were degenerative disc disease of the cervical spine, obesity, an affective mood disorder, and polysubstance abuse disorder. (R. 18). At step three, the ALJ concluded that Plaintiff's obesity and neck impairments did not meet or medically equal a listed impairment, either singly or in combination. (R. 19). Plaintiff's mental impairments, however, met the requirements of listing 12.04 (affective disorders) and listing 12.09 (substance abuse disorder) because Plaintiff experienced marked restrictions in his social functioning and concentration, persistence, and pace when he used drugs and alcohol. (R. 19-20). Because such a finding meant that Plaintiff would be disabled, the regulations required the ALJ to determine if Plaintiff would continue to be disabled if he did not have a substance abuse disorder. *See* 20 C.F.R. § 404.1535(b)(1). The ALJ

concluded that substance abuse materially contributed to Plaintiff's mental functioning and that he would not meet or equal a listed impairment if he did not use drugs or alcohol. (R. 20-21). Accordingly, the ALJ continued with the five-step analysis.

Before moving to step four, the ALJ found that Plaintiff's testimony concerning the severity of his symptoms was not fully credible. The ALJ also gave only some weight to the report issued by Plaintiff's wife and to the written opinion of consulting psychiatrist Dr. Kenneth Levitan. (R. 27-28). Great weight was given to the physical RFC report issued by non-examining expert Dr. Julio Pardo. (R. 27). The ALJ assigned moderate weight to an RFC report submitted by Plaintiff's treating physician Dr. Syed Akhter but dismissed a mental RFC issued by treating psychiatrist Dr. Michael Reinstein by giving it slight weight. (R. 28, 31). The ALJ further adopted and rejected parts of a report given by treating psychiatrist Dr. Zachary Friedman. (R. 31-32).

The ALJ then formulated a complex RFC assessment that fell into two parts. He concluded that if Plaintiff stopped abusing drugs and alcohol, then prior to July 2012 he would be able to perform light work with no additional exertional or non-exertional restrictions. Multiple mental restrictions, however, would be required. Plaintiff could not focus for extended periods of time; could only have casual contact with the general public and co-workers; would be restricted to "dealing with things as opposed to people"; and could be off-task for five percent of the time. (R. 22). That RFC changed, however, as of July 2012 based on the ALJ's conclusion that Plaintiff's neck condition had worsened at that time. The ALJ now found that Plaintiff could carry out what he identified as sedentary work, though he also concluded that Plaintiff could stand and walk for six hours during an eight-hour workday. Numerous non-exertional limitations

were also identified. As for the mental RFC, the ALJ removed the restriction that Plaintiff could be off-task for five percent of each workday. (R. 28-29). Based on these findings, the ALJ found at step four that Plaintiff could not perform his past relevant work as a hotel manager and bartender. (R. 32). Relying on the testimony of the VE, the ALJ further found that a significant number of jobs existed in the national economy that Plaintiff could perform both before and after July 2012. (R. 32-33). He therefore concluded that Plaintiff was not disabled.

## LEGAL STANDARD

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, a court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841)).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "provide a complete

written evaluation of every piece of testimony and evidence.'"  *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)).  Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.  *Keener v. Astrue*, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[1]  A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a); *Crawford v. Astrue*, 633 F. Supp.2d 618, 630 (N.D. Ill. 2009).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry, which involves analyzing "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).  "The claimant bears the burden of proof in each of the first four steps."  *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).  If the

---

[1]     The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*, and are virtually identical to the SSI regulations set forth at 20 C.F.R. § 416.901 *et seq.*

claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp.2d 1131, 1139-40 (N.D. Ill. 2012).

## DISCUSSION

Plaintiff argues that the ALJ erred by (1) not demonstrating that substance abuse materially contributed to Plaintiff's mental limitations, (2) incorrectly assigning weights to various expert medical reports, and (3) failing to adequately explain how the record supports the mental RFC assessment. The Court agrees that remand is required on each of these topics.

### A.    Plaintiff's Substance Abuse

A claimant who is addicted to drugs or alcohol cannot be found to be disabled for social security purposes on that basis alone. However, substance abuse may impose restrictions on a claimant's ability to work. When that is the case, and when the claimant is found to be disabled, he is not entitled to disability benefits if substance abuse is "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). Thus, "[w]hen an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the [ALJ] is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006). If the claimant is disabled, the ALJ must evaluate which of her current limitations would remain if the claimant stopped using alcohol or drugs. 20 C.F.R. § 404.1535(b)(2); *see also Whitney v. Astrue*, 889 F. Supp.2d 1086, 1094 (N.D. Ill. 2012).

As noted, the ALJ found that if Plaintiff stopped using drugs and alcohol, he would have moderate instead of marked restrictions in his social functioning and in his ability to maintain concentration, persistence, and pace, thereby precluding him from meeting or equaling the requirements of listing 12.04. *See* 20 C.F.R. Pt. 404, Subpt. P, App.1, at § 12.04(B) (requiring at least two marked limitations in a claimant's activities of daily living, social functioning, or concentration, or one marked restriction plus a finding of repeated episodes of decompensation). The ALJ approached this issue on two fronts. First, he concluded throughout the decision that Plaintiff's need for serious psychiatric interventions such as hospitalization was precipitated by his use of drugs and alcohol. That was based, in part, on the ALJ's belief that Plaintiff's symptoms were well controlled by medication when he was not abusing these substances. Second, the ALJ cited specific record evidence that he thought supported a finding that, without substance abuse, Plaintiff would experience moderate instead of marked restrictions in social functioning and in his ability to concentrate.

Substantial evidence does not support either of the ALJ's lines of reasoning. Part of the problem is that the ALJ was uncertain when, or even if, Plaintiff had stopped using two of the three substances that allegedly contributed to the debilitating emotional symptoms he experienced at times – cocaine, Xanax, and alcohol. The ALJ stated that Plaintiff's cocaine abuse went into remission at some point between 2009 and 2010 but that it was unclear "whether claimant's alcohol and Xanax abuse are in current partial or full remission." (R. 18). The ALJ's uncertainty on this critical issue created an evidentiary conundrum: If the ALJ did not know if Plaintiff continued to use alcohol or Xanax throughout the disability period, it is difficult to understand how he went about

11

deciding what part of the record reliably reflected what Plaintiff's mental functioning would be if he were fully sober. As shown below, the ALJ addressed the issue by citing evidence that frequently misread what Plaintiff's treating physicians stated or made assumptions about Plaintiff's substance use that the record contradicts.

The ALJ's first evidentiary support illustrates the problem. The ALJ cited several years' of treatment notes from Plaintiff's primary care physician Dr. Akhter to claim that Plaintiff displayed normal affect and was functional when he abstained from using substances like Xanax. (R. 25). It is true that Dr. Akhter stated at times that Plaintiff was functional with medication. The ALJ failed to recognize, however, that one of the medications that enabled Plaintiff to function adequately was Xanax, which Dr. Akhter prescribed on numerous occasions. (R. 555, 558-62, 564, 566, 569, 571, 573, 575, 577, 581, 595). The ALJ could not logically cite Dr. Akhter's notes as evidence that Plaintiff could control his symptoms if he abstained from Xanax when Dr. Akhter repeatedly treated Plaintiff's anxiety with that medication. The ALJ's oversight of Dr. Akhter's use of Xanax fails to build a logical bridge between the record and the ALJ's belief that Xanax "stood in the way of [Plaintiff's] ability to manage his depression and anxiety." *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("The ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion.").

Having relied on Dr. Akhter's notes to claim that Plaintiff's symptoms were well controlled, the ALJ then cited the same notes as evidence that substance abuse substantially contributed to his mental downturns. The ALJ noted that Plaintiff was sometimes inconsistent in how he accounted for his use of drugs and alcohol to Dr.

Akhter and to the social workers he saw at Community Counseling. (R. 26). That fact is undisputed. That does not mean, however, that substance abuse was a material factor in causing Plaintiff's mental turmoil. The ALJ tried to make that point by engaging in a series of illogical inferences. He noted, for example, that Plaintiff told Dr. Akhter in July 2008 that he had not been using illicit substances. (R. 26, 595). The ALJ said that Plaintiff misled Dr. Akhter at that time because a September 2009 note from Community Counseling stated that he had tested positive for recent cocaine use. (R. 26, 514). The fact that Plaintiff took cocaine in September 2009, however, does not shed any light on the relation between substance abuse and Plaintiff's condition fourteen months earlier in July 2008. Nor does it demonstrate that substance abuse exacerbated Plaintiff's condition in September 2009. Contrary to the ALJ's belief, Dr. Akhter actually noted on September 28, 2009 that Plaintiff had been "much more stable with medication" and had not experienced any episodes of panic attack since his last visit. (R. 569). That undercuts the ALJ's claim that Plaintiff's cocaine use in September 2009 was a major cause of his symptoms. Moreover, Dr. Akhter renewed Plaintiff's Xanax prescription at that visit, strongly indicating that he thought that Xanax improved Plaintiff's condition instead of making it worse. (R. 569).

That is not to say that no evidence exists supporting the ALJ's belief that Plaintiff abused Xanax. The ALJ cited Plaintiff's self-report to Community Counseling employee Nina Henry LPHA (Licensed Practitioner of the Healing Arts) that "he abuses his Xanax."[2] (R. 506). Whether Plaintiff abused Xanax or was even addicted to it,

---

[2]     Ms. Henry also noted that Plaintiff's substance use had both positive and negative consequences. Among other things, it improved his social skills, helped him maintain relationships, and reduced his symptoms of discomfort. It also contributed to his irritability and anxiety. (R. 507). Even if the ALJ had cited these entries (which he did not), he would have

however, does not address the issue at hand. The relevant questions are whether Xanax materially contributed to Plaintiff's marked restrictions in social functioning and concentration, and what his restrictions would be if he stopped using it. The ALJ was unable to identify a physician or psychiatrist who found that Xanax caused Plaintiff's problems. No expert appeared at the hearing to explain the effect that Xanax or any other substance had on Plaintiff's mental health.

More importantly, the record strongly suggests that Xanax did not have the adverse effect on Plaintiff's mental condition that the ALJ assumed was the case. In addition to Dr. Akhter's many Xanax prescriptions, other treating physicians prescribed the tranquilizer to alleviate Plaintiff's symptoms. Xanax was used in September 2008 to treat Plaintiff after he was admitted to St. Elizabeth's hospital and on January 7, 2014 when he was admitted to Advocate Illinois for psychiatric treatment. (R. 449, 869). The psychiatrists who treated Plaintiff in these hospital settings clearly thought that Xanax was therapeutic, not that it exacerbated Plaintiff's mental condition. The ALJ tried to support his belief that Xanax was a primary cause of Plaintiff's mental dysfunction by suggesting that his March 2011 hospitalization at St. Mary's was triggered by his alleged abuse of that drug. (R. 25). Yet blood tests taken upon admission to St. Mary's showed no traces of benzodiazepine drugs, which include Xanax. (R. 660). By failing to recognize that Plaintiff's physicians prescribed Xanax over a multi-year period to treat his mental condition, the ALJ had no ground for finding that Xanax was responsible for

---

been required to explain why Plaintiff's social functioning would improve without the use of substances when Ms. Henry said he functioned better with substances. As it stands, however, the entry cannot act as an evidentiary "gap filler" for the ALJ's decision because "regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ." *Steele*, 290 F.3d at 941.

Plaintiff's marked limitations or that he could control his symptoms if he abstained from using it. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

The ALJ placed less weight on Plaintiff's use of cocaine and alcohol, though he attempted to link Plaintiff's use of those substances to his periodic mental downturns. Like the evidence concerning Xanax, however, the ALJ failed to demonstrate any causal link between substance abuse and Plaintiff's condition. The ALJ claimed that Plaintiff's cocaine use was the cause for his 2008 hospitalization at St. Elizabeth's. (R. 19). Intake notes from St. Elizabeth's noted the use of alcohol and cocaine. (R. 452). At no point, however, did Plaintiff's psychiatrists attribute his need for hospitalization to substance abuse. (R. 448-53). That makes it unclear why the ALJ found a connection between substance abuse and Plaintiff's psychosis. Plaintiff's cocaine use went into remission by 2010, so that drug had no relation to any part of the subsequent record. The ALJ attributed Plaintiff's March 2011 psychiatric hospitalization at St. Mary's to drug and alcohol use. (R. 25). Yet blood tests carried out at the hospital show that Plaintiff had not been using illicit drugs or alcohol prior to admission. (R. 666). Nor did Plaintiff's treatment plan at St. Mary's cite sobriety as a goal, suggesting that his psychiatrists did not believe that a causative link existed between substance abuse and Plaintiff's psychotic episode. (R. 667). By speculating about the medical causes of Plaintiff's decompensations without any supporting medical testimony or evidence, the ALJ erroneously "played doctor" by reaching his own conclusions on a topic in which he

had no expertise.  *See Rohan v. Chater*, 89 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Instead of citing substance abuse, many of Plaintiff's medical treaters attributed his severe mental downturns to the fact that Plaintiff did not always take his psychotropic medications on a regular basis.  Notes from St. Mary's and St. Elizabeth's, for example, both attribute Plaintiff's decompensation to medical non-compliance.  Plaintiff also reported that he had not taken his medications for three weeks prior to his 2014 admission to Advocate Illinois.  (R. 868).  To his credit, the ALJ recognized Plaintiff's failure to comply with his medication regimen.[3]  The ALJ never explained, however, why he thought that substance abuse played a crucial role in Plaintiff's need for hospitalizations when Plaintiff's doctors attributed the problem to medical non-

---

[3]  The ALJ's brief consideration of this issue appears to have construed Plaintiff's inability to comply with his medication requirements against him.  The ALJ found, for example, that Plaintiff's 2011 hospitalization at St. Mary's did not constitute an episode of decompensation, in part, because it was triggered by Plaintiff's failure to take his medications.  (R. 19).  That suggests that the ALJ did not properly construe what the regulations require.  He found that none of Plaintiff's hospitalizations involved an episode of decompensation because they were not of extended duration.  But an episode of decompensation is not necessarily the same as an episode of extended duration.  An episode is demonstrated "by an exacerbation in symptoms or signs that would ordinarily require increased treatment[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1, at § 12.00(C)(4).  An episode of extended duration is an episode that lasts for two weeks, though shorter episodes can still satisfy the durational requirement under some conditions.  *Id.*  The fact that Plaintiff's hospitalizations were not of extended duration, much less that they were triggered by medical non-compliance, does not prevent them from potentially being episodes of decompensation.  *See Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010) ("An incident – such as hospitalization or placement in a halfway house – that signals the need for a more structured psychological support system would qualify as an episode of decompensation.").  Changes in medication outside of a hospital setting can also signal an episode.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, at § 12.00(C)(4).  Since this case already requires remand, the ALJ should re-evaluate the question of whether Plaintiff had any episodes of decompensation, as well as whether he satisfied the durational requirement by experiencing "more frequent episodes of shorter duration."  *Id.*  As part of that, the ALJ should consider that Dr. Reinstein assessed three or more episodes of decompensation, and Dr. Freidman found one or two episodes of extended duration.  (R. 403, 1005).

compliance.  The ALJ should have recognized that Plaintiff's periodic inability to follow his doctors' directives could have been a symptom of his bipolar disorder, not a sign that substance abuse was at issue.  Courts have repeatedly stated that "mental illness and bipolar disorder in particular . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment."  *Kangail*, 454 F.3d at 630.  *See also Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (noting that "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently"); *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010).  The ALJ did not consider the relation between Plaintiff's medical non-compliance, his mental impairment, and his periodic need for specialized psychiatric care.  That not only ignores the record, it fails to consider the possibility that Plaintiff's use of drugs and alcohol was an attempt to relieve his troubling symptoms, not the cause of them.  *See Kangail*, 454 F.3d at 629 (stating that "bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms").  Dr. Akhter said as much as early as 2007 by finding that when Plaintiff ran out of Xanax, he increased his drinking in an attempt to control his anxiety.  (R. 607).

The ALJ's silence on this aspect of Plaintiff's condition is made more problematic by his failure to recognize the lengths to which Plaintiff's psychiatrists went to treat his symptoms and the scope of the medication regimens they imposed on him.  Plaintiff was prescribed a complex array of tranquilizers, antidepressants, antipsychotics, and sleeping medications over time, often in shifting combinations with one another.  These included Trazadone, Zoloft, Busperone, Xanax, Ambien, Latuda, Seroquel, Paxil, Abilify, Klonopin, Depakote, Lithium, Haldol, Lexapro, Sinequan, Thorazine, Ativan, and

Restoril.  Plaintiff also took medications for other problems, including Lisinopril, Avalide, Toprol-XL, Meloxicam, Gemfibrozil, Albuterol, Amlodipine, Atorvistatin, Prednisone, Moxifloxacin, Nitroglycerin, Vicodin, Norco, and Morphine.  Indeed, Plaintiff was taking twenty different medications when he was admitted to Advocate Illinois in 2014.  (R. 869).  Even an individual who does not suffer from bipolar disorder might reasonably be expected to have difficulty in taking combinations of these medications on a regular basis.  Not surprisingly, Plaintiff stated that he needed help in taking his prescriptions. (R. 370).  Yet the ALJ overlooked all of Plaintiff's psychotropic medications except for Xanax, Seroquel, and Latuda.  (R. 26).  *See Spaulding v. Astrue*, 702 F. Supp.2d 983, 999 (N.D. Ill. 2010) (stating that an ALJ errs when he fails to consider all of a claimant's relevant medications).  The ALJ's failure to consider Plaintiff's ability to comply with this complex medication treatment fails to support the ALJ's conclusion that a causal link existed between Plaintiff's use of drugs and alcohol and his fluctuating bipolar symptoms.

In addition to a broad claim that substance abuse exacerbated Plaintiff's symptoms, the ALJ also gave specific reasons why his social functioning was markedly limited on drugs but would only be moderately restricted if Plaintiff were sober.  The ALJ said that Plaintiff was agitated and irritable when he took drugs.  (R. 19).  That fails to distinguish between Plaintiff's behavior before and after his cocaine use went into remission.  He was also "very agitated" at an August 2011 treatment session, was panicky during a June 2012 meeting with Dr. Akhtar, and became so irritable in May 2014 that he broke items in his kitchen during an argument with his wife.  (R. 714, 797, 898).  The ALJ also thought that the marked social restriction prior to sobriety was

justified because consulting psychiatrist Dr. Levitan abruptly ended his interview with Plaintiff in May 2011 when Plaintiff became aggressive. But the ALJ never explained why substance abuse was responsible for Plaintiff's agitation during the psychiatric exam. Plaintiff had been released from St. Mary's in late March 2011, where no substance abuse had been noted, and the ALJ cited no evidence that Plaintiff used drugs or alcohol between that date and his May 28, 2011 interview with Dr. Levitan. Far from supporting the ALJ's conclusion, that suggests that Plaintiff had a marked social restriction even when he was not taking drugs.

The ALJ thought that Plaintiff's social functioning would improve without substances because he maintained a good relationship with his primary care physician during remission. However, the ALJ cited no evidence suggesting that Plaintiff had a difficult relationship with Dr. Akhter even when he used cocaine. By contrast, evidence shows that Plaintiff was unable to function at times vis-à-vis his other medical treaters whether he was drinking or not. Plaintiff testified that anxiety prevented him from leaving his home to keep some of his doctors' appointments or even to go beyond his front door. (R. 54, 57, 59-60, "I'm just stuck in there."). The record supports that testimony. Plaintiff was unable to leave his home on May 7, 2014 in a timely manner to meet with his psychiatrist due to anxiety. (R. 898). On April 10, 2014, he told psychiatrist Dr. Friedman that had been experiencing significant difficulty in leaving his home for three weeks because of anxiety. (R. 904). Accordingly, Plaintiff testified at the second hearing in 2014 that Advocate Illinois had recommended more intense treatment and would soon begin sending a therapist to his home to provide treatment, including phone calls that had already begun at the rate of two a day. (R. 56-57).

Instead of discussing those facts, the ALJ found that Plaintiff's social functioning would improve because he was working to repair the relationship with his wife following a multi-year affair with another woman. (R. 20). *See* 20 C.F.R. Pt. 404. Subpt. P, App.1, at §12.00(c)(2) (stating that social functioning includes a claimant's relations with family members). The ALJ never explained what that had to do with substance abuse. He overlooked that Plaintiff and his wife both described highly-strained relations between Plaintiff and his family. Ms. Alma complained that Plaintiff "will not talk or spend time with anyone," while Plaintiff testified that he does not talk to his children, suffers from serious mood swings, and can easily "snap" by suddenly becoming extremely angry. (R. 58, 137, 372). The ALJ cited treating psychiatrist Dr. Friedman's expert report to support his conclusion that Plaintiff would only have a moderate restriction in social functioning without substance abuse. In reality, however, Dr. Friedman directly contradicted that conclusion by stating that Plaintiff's social limitation was marked. (R. 1005).

The ALJ's reasons for distinguishing between marked and moderate restrictions in Plaintiff's ability to maintain concentration are equally flawed. The ALJ found a marked limitation when Plaintiff used drugs and alcohol because they allegedly caused auditory hallucinations. As noted above, Plaintiff also suffered from auditory hallucinations during his 2011 hospitalization at St. Mary's, where blood tests revealed no drug or alcohol use, and during his 2014 stay at Advocate Illinois, when he had not been drinking. The ALJ further reasoned that Plaintiff could not complete projects when he used drugs. But he cited no evidence suggesting that Plaintiff's inability to do so was related to substance abuse or that his capacity for finishing tasks improved when he

was sober. Plaintiff's wife testified that had had "no interest in completing tasks." (R. 382). Certainly, Plaintiff's ability to take his medications consistently had not improved by stopping drugs and alcohol; Dr. Panguluri's May 7, 2014 intake assessment at St. Mary's Hospital states that Plaintiff had not taken his medications for the past three weeks. (R. 868). Nevertheless, the ALJ reasoned that Plaintiff's ability to maintain concentration was greater when he was sober because he was able to watch television. (R. 21). Even assuming that the ability to watch television is relevant to the concentration needed to work on a full-time basis, Plaintiff's wife stated that his capacity for doing so had decreased in recent years and that he no longer payed attention to what he watched. (R. 372).

Finally, the ALJ thought that Plaintiff's capacity for maintaining concentration would improve during sobriety because Dr. Friedman's July 1, 2014 expert report assessed a moderate restriction in concentration, persistence, and pace. (R. 1005). That is true, but the ALJ failed to note that Dr. Friedman's assessment conflicted with other expert evidence. Treating psychiatrist Dr. Reinstein found that Plaintiff would have "frequent" deficiencies in the ability to concentrate and that he had "poor or no" ability to maintain regular work attendance, complete a normal workday, perform at consistent pace, or sustain an ordinary routine without special supervision. (R. 402-03). Dr. Reinstein did not attribute those problems to substance abuse, and the ALJ never discussed the issue. Moreover, consulting psychiatrist Dr. Levitan stated that Plaintiff "would have difficulty handling regular work pressure and stress," even though the ALJ cited no evidence showing that Plaintiff had been taking drugs or alcohol prior to Dr.

Levitan's interview. (R. 672). As discussed more fully below, the ALJ never reconciled these conflicting assessments.

Without adequately explaining how Plaintiff's substance abuse affected his mental functioning, and in the absence of any discussion of why his social functioning and concentration would improve without drugs or alcohol, the ALJ failed to build a logical bridge between the record and his conclusion that substance abuse materially contributed to Plaintiff's marked restrictions in social functioning and ability to maintain concentration, persistence, and pace.

## B. The Medical Expert Opinions

The regulations require ALJs to "evaluate every medical opinion we receive" regardless of its source. 20 C.F.R. § 404.1527(c). An ALJ does so by applying six factors set out in the regulations, including the nature of the treating relationship, the physician's specialty, and the consistency between the expert conclusions and other record evidence. *Edge v. Berryhill*, No. 15 CV 50292, 2017 WL 680365, at *4 (N.D. Ill. Feb. 21, 2017) ("An ALJ is not only required to evaluate every medical opinion in the record . . . but he must do so by applying the checklist of six factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6)."). Plaintiff argues that the ALJ failed to comply with this directive in his evaluation of the reports issued by consulting psychiatrist Dr. Levitan, treating psychiatrists Dr. Friedman and Dr. Reinstein, and treating physician Dr. Akhter.

### 1. Dr. Levitan

Dr. Levitan examined Plaintiff on May 28, 2011 but was unable to complete the examination after Plaintiff became so aggressive that the psychiatrist terminated the interview after feeling threatened by Plaintiff. Nevertheless, Dr. Levitan concluded that

Plaintiff would experience difficulty in handling regular work pressure and stress. (R. 672). The ALJ rejected that finding and gave slight weight to the expert report on the ground that Plaintiff had taken unprescribed Xanax on March 2, 2011 and failed to report it to Dr. Levitan. (R. 27). That fails to build any bridge between the record and the ALJ's consideration of the expert report. For the reasons discussed above, the ALJ never explained why Xanax contributed to Plaintiff's mental impairment when his treating physicians repeatedly used it to treat his symptoms. Even if such a link existed, moreover, the ALJ failed to show that it was at work during Dr. Levitan's exam. Plaintiff was hospitalized at St. Mary's on March 16, 2011, where blood tests showed that he had not been using drugs like Xanax. (R. 660). The ALJ cited no evidence suggesting that Plaintiff took Xanax between his discharge from St. Mary's on March 21, 2011 and his exam with Dr. Levitan on May 28, 2011. That left a three-month gap between Plaintiff's last documented use of Xanax and his interview with Dr. Levitan. Assuming that a link existed between Xanax and Plaintiff's mental downturns, therefore, the ALJ did not show that it was at issue when Plaintiff saw the consulting psychiatrist. That requires the ALJ to restate his reasons for evaluating Dr. Levitan's report and to consider the finding that Plaintiff would experience difficulty in handling the stress of ordinary work.

### 2. Dr. Reinstein

The ALJ also gave slight weight to the October 13, 2013 expert report of treating psychiatrist Dr. Michael Reinstein. Dr. Reinstein found, *inter alia*, that Plaintiff had an extreme restriction in his social functioning, would experience frequent deficiencies in his ability to concentrate, and would need to be absent from work twice a month due to

his mental impairment. (R. 402-03). An ALJ is required to give controlling weight to a treating source opinion when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence[.]" 20 C.F.R. § 404.1527(d)(2).

The ALJ discounted Dr. Reinstein's report because it did not contain "objective observations," did not account for Plaintiff's substance abuse, conflicted with Dr. Akhter's report, and because Dr. Reinstein had only treated Plaintiff for a few months. (R. 28). None of these reasons constitute substantial evidence for the ALJ's evaluation of the report. The ALJ never explained what he meant by requiring "objective observations." Dr. Reinstein filled out a questionnaire that included checkboxes similar to those routinely used in the Psychiatric Review Techniques and mental RFC assessments submitted by the Social Security Administration's psychological experts. This was not limited to merely re-stating Plaintiff's subjective complaints, as the ALJ stated. Instead, Dr. Reinstein evaluated Plaintiff's capacity for sustaining work activity, following instructions, and getting along with co-workers. Insofar as the ALJ believed that Dr. Reinstein was required to cite objective psychological tests to support his report, many courts have rejected such an assumption when mental functioning is at issue. *See*, *e.g.*, *Ripley v. Colvin*, No. 12 C 9462, 2014 WL 2457702, at *12 (N.D. Ill. June 2, 2014) (citing cases). Dr. Reinstein's report was based on his expert observation of Plaintiff during mental status exams, including Plaintiff's symptoms. The ALJ failed to note that the listings themselves state that mental conditions are assessed by evidence that includes a claimant's "symptoms." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at § 12.00(B). As discussed below, moreover, the ALJ gave significant weight to parts

of Dr. Zachary Friedman's report even though it cited no more "objective" tests than did Dr. Reinstein's. (R. 1000-06). The ALJ was not entitled to apply a criterion to discount Dr. Reinstein's report without also using it in relation to Dr. Friedman's.

The ALJ's remaining reasons are no more persuasive. He criticized Dr. Reinstein for only having treated Plaintiff for a few months but failed to explain why the same reasoning did not apply to Dr. Friedman, who had seen Plaintiff for less than six months before issuing his report. (R. 1000). Dr. Friedman and Dr. Reinstein were both treating sources who were considerably more familiar with Plaintiff's functioning than any other medical source. Nevertheless, the ALJ faulted Dr. Reinstein because he did not address the relation between Plaintiff's symptoms and his substance abuse. As shown above, however, the ALJ did not properly explain why a causal relation existed between the two. Dr. Reinstein's report contained a narrative section concerning the "extent, if any" that drugs or alcohol affected Plaintiff's symptoms. (R. 403). Dr. Reinstein did not fill it out, though he completed every other section in the report. Since the ALJ had no knowledge of why Dr. Reinstein chose not to describe a relation between drugs and Plaintiff's symptoms, the ALJ should have considered the possibility that Dr. Reinstein did not believe that such a link existed.

As for Dr. Akhter's report, which found that Plaintiff could carry out low-stress work, the ALJ did not address why Dr. Akhter was more reliable on this issue than Dr. Reinstein. The regulations require an ALJ to consider an expert's field of specialty. 20 C.F.R. § 404.1527(b)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Dr. Reinstein was a psychiatrist with specialized

training in assessing Plaintiff's ability to tolerate work stress; Dr. Akhter was Plaintiff's primary care physician. The ALJ was obligated to explain why Dr. Akhter's non-specialized finding was more reliable that Dr. Reinstein's before using it to give less weight to the treating psychiatrist's report. That requires remand so that the ALJ can restate the basis of his reasoning with greater clarity.

### 3. Dr. Akhter

The ALJ assigned moderate weight to Dr. Akhter's report, which was issued on August 6, 2012. (R. 761-64). Dr. Akhter thought that Plaintiff's physical RFC was significantly more limited than either of the two assessments the ALJ included in his decision. Plaintiff could rarely lift and carry even less than ten pounds; had multiple non-exertional restrictions in his ability to stoop, crouch, and move his head; and had significant restrictions in using his left arm for overhead reaching. Dr. Akhter also stated that Plaintiff could only stand for one hour before he would need to sit and that he could not stand for even two full hours during an eight-hour workday.

The ALJ discounted these findings by stating that pain, which Dr. Akhter cited as a basis for the RFC assessment, "is not an impairment nor a recognized diagnosis." (R. 31). That gave the ALJ no ground for criticizing Dr. Akhter's report. Plaintiff's pain was clearly a symptom of his severe cervical disc disease. The inclusion of a claimant's symptoms like pain is not only appropriate in a medical opinion, it constitutes an essential element of an expert report. The regulations define a medical opinion like Dr. Akhter's as a statement "reflecting judgments about the nature and severity of your impairment(s), *including your symptoms*, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §

404.1527(a)(1) (emphasis added). Instead of criticizing Dr. Akhter on this point, the ALJ was required to consider whether the record supported the doctor's conclusions. A cervical spine study conducted in March 2012 showed multi-level degenerative disc disease and osteoarthritis in Plaintiff's neck, while a July 2012 MRI revealed extensive cervical spondylosis, degenerative disc disease, and osteophyte complexes in the neck. (R. 758, 787). Dr. Akhter prescribed Vicodin to treat Plaintiff's pain and referred him to an orthopedic specialist. Plaintiff's complaints about neck pain continued throughout 2014. (R. 1040-47). Plaintiff described his pain in January 2014 as a sharp sensation that radiated down his left arm, causing pain at a level of seven out of ten with medication and nine out of ten without it. (R. 1047). If the ALJ disagreed with Dr. Akhter's assessment of this evidence, then he was required under SSR 96-2p to explain why the report was not well-supported by the record, and thus not entitled to controlling weight, as well as to discuss the weight that should have been given to it by "using all of the factors" set out in the regulations. SSR 96-2p.

The ALJ also rejected Dr. Akhter's RFC on the basis that Plaintiff's neurological exams were normal and that he had intact reflexes and sensations. But Dr. Akhter never claimed that Plaintiff suffered from a neurological problem that affected his reflexes; his RFC was based instead on objective tests that demonstrated severe degenerative changes in Plaintiff's cervical spine. The ALJ never addressed why Plaintiff's reflexes cast any light on that issue. The ALJ further criticized Dr. Akhter because it was allegedly "incongruous" for the doctor to have found that Plaintiff could stand for one hour at a time but could only stand for less than two hours during a normal workday. (R. 31). The plain meaning of Dr. Akhter's RFC, however, is that Plaintiff

could stand for a full sixty minutes at one stretch and would then be able to stand off and on for up to fifty-nine minutes during the rest of the workday.  The ALJ cited no evidence that he thought refuted such a finding.  Accordingly, substantial evidence does not support the ALJ's consideration of Dr. Akhter's expert report.

### 4.    Dr. Zachary Friedman

Treating psychiatrist Dr. Friedman issued his report on July 1, 2014.  Dr. Friedman noted that Plaintiff had struggled with significant anxiety and panic that made it difficult at times for him to leave his house.  He assessed marked restrictions in Plaintiff's ADLs and social functioning but thought that Plaintiff would only experience moderate restrictions in his ability to maintain concentration, persistence, and pace. Nevertheless, Dr. Friedman found that Plaintiff would not be able to meet competitive standards for completing a normal workday without experiencing an unreasonable number of interruptions and could not maintain attention for two-hour periods.  (R. 1003).  He also found that Plaintiff's mental symptoms would require him to be absent from work more than four days each month, though Dr. Friedman did not expect his impairment to last more than twelve months with treatment.  (R. 1000-06).

The ALJ assigned significant weight to Dr. Friedman's RFC assessment concerning Plaintiff's ability to maintain concentration, persistence, and pace. Unfortunately, the ALJ did not provide any explanation of why he did so.  Despite Dr. Friedman's overall finding of a moderate restriction, he also thought that Plaintiff would be unable to maintain a normal work pace without experiencing an unreasonable number of interruptions.  (R. 1003).  Such a finding calls into question how Plaintiff would be able to maintain full-time work on a sustained basis even with a moderate

restriction in concentration, persistence, and pace. The ALJ overlooked Dr. Friedman's finding, thereby failing to explain how the expert's report supported a conclusion that Plaintiff would be able to sustain a normal work schedule.

The ALJ may have thought that he addressed this issue by taking note of Dr. Friedman's finding that Plaintiff's symptoms would require him to miss more than four days of work each month. The ALJ did not think that barred full-time work because Dr. Friedman also found that Plaintiff's condition was not expected to last more than twelve months with treatment. But the record plainly shows that Plaintiff's mental symptoms had already persisted for many years notwithstanding extensive treatment, including therapy, medications, and hospitalizations. Moreover, Plaintiff's other treating psychiatrist Dr. Reinstein disagreed with Dr. Friedman, stating that Plaintiff suffered from a chronic illness that made his prognosis "very guarded." (R. 401). The ALJ was not entitled to adopt Dr. Friedman's conclusion without explaining why he chose it over Dr. Reinstein's equally-expert conclusion. *See Young*, 363 F.3d at 1001 ("Weighing conflicting evidence from medical experts, however, is exactly what the ALJ is required to do."). The ALJ stressed in other parts of his decision that Plaintiff's functioning improved in March 2014 after he began taking Latuda. (R. 30). Insofar as the ALJ believed that addressed the issue, he failed to account for the fact that Plaintiff's condition fluctuated over time and had not heretofore been successfully treated on a sustained basis. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated.").

The ALJ rejected Dr. Friedman's other domain findings by stating that Plaintiff's treatment records show that he can manage his symptoms with medication. That fails to explain anything meaningful about Plaintiff's functioning for the reasons discussed earlier. The ALJ never noted that Dr. Friedman thought that Plaintiff had a marked limitation in social functioning. In addition, both Dr. Reinstein and Dr. Friedman thought that Plaintiff had a marked restriction in his ability to carry out ADLs. The ALJ disagreed with that finding by citing an October 2010 form from Community Counseling stating that Plaintiff had a mild restriction in "self-care." (R. 28, 462). That falls far short of explaining why the ALJ rejected the conclusions of Plaintiff's treating psychiatrists. The form the ALJ cited was an intake checkbox issued by Jennifer Labrador, QMHP (Qualified Mental Health Practitioner). The ALJ never explained why a non-specialist like Ms. Labrador was more qualified to assess Plaintiff's functioning on an intake form than experts like Dr. Friedman or Dr. Reinstein were after treating Plaintiff for several months. Moreover, the intake form that Ms. Labrador completed only stated that she assessed a mild self-care restriction because Plaintiff was able to get out of bed and eat one meal a day. (R. 463). Even if such minimal activities supported Ms. Labrador's finding, the regulations define ADLs as more than the ability to care for one's self. They also include "activities such as cleaning, shopping, cooking, taking public transportation, paying bills, [and] maintaining a residence." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at § 12.00(B)(1). The ALJ never considered these issues in his evaluation of Dr. Friedman's or Dr. Reinstein's ADL assessment. Dr. Friedman stated that Plaintiff could not use public transportation. (R. 1004). Plaintiff testified that he had not cleaned or done housework "in years." (R. 137). Nor does he shop or even leave his house for long

periods of time.  (R. 54, 59, 138).  The ALJ's silence on these issues, combined with his failure to discuss more fully how the record contradicts Dr. Friedman's other findings, does not explain the weight the ALJ assigned to the expert report.  Remand is therefore required so that the ALJ can restate the basis of his reasoning concerning the reports of Dr. Friedman, Dr. Akhter, Dr. Reinstein, and Dr. Levitan.

### C.    The RFC

As noted, the ALJ formulated two RFC assessments based on his belief that Plaintiff's cervical spine condition deteriorated after July 2012, thereby requiring an RFC of sedentary work with non-exertional restrictions instead of the light work that was assessed prior to July 2012.  The ALJ did not believe that Plaintiff's mental condition became worse after July 2012 though, as discussed below, he altered the mental RFC notwithstanding that finding.  Plaintiff challenges the ALJ's mental RFC assessments but does not discuss the physical RFC.  Since this case already requires remand, however, the Court addresses both of the ALJ's assessments.

The ALJ gave great weight to the physical RFC issued in August 2011 by state-agency expert Dr. Julio Pardo, who found that Plaintiff could perform light work.  (R. 27). That supports the ALJ's assessment of light work prior to July 2012.  However, the ALJ neither explained how he went about assessing the RFC of sedentary work after July 2012 nor properly identified what that work constituted.  The ALJ described the sedentary work that Plaintiff could perform as the ability to "stand and walk for six hours in an eight-hour workday and could sit for six hours in an eight-hour workday."  (R. 28). That condition is incompatible with sedentary work.  The regulations define sedentary work as involving only occasional walking or standing, meaning that a claimant is only

required to walk or stand no more than two hours during an eight-hour workday.  *See* SSR 83-10; *Haynes v. Barnhart*, 416 F.3d 621, 627 n.2 (7th Cir. 2005).  A claimant who is able to walk or stand for up to six hours a day is capable of doings so "frequently" under SSR 83-10.  *See* SSR 83-10 ("'Frequent' means occurring from one-third to two-thirds of the time.").  The ALJ's exertional restrictions suggest that he meant to find that Plaintiff had the ability to work at a reduced range of light work, not sedentary work.  *See* 20 C.F.R. § 404.1567(b) (defining the requirements of light work).

The ALJ's confusion on this point is not erroneous in itself, as a person who can carry out light work is deemed to be able to perform sedentary work.  *See* 20 C.F.R. § 404.1567(b).  However, the ALJ gave no reason why Plaintiff could carry out tasks at a reduced range of light work after July 2012.  Only Dr. Pardo and Dr. Akhter issued physical RFCs, and the ALJ disagreed with both assessments concerning Plaintiff's functioning after July 2012.  That left it to the ALJ to explain what evidence supported the RFC and how he inferred from it that Plaintiff could perform a reduced range of light work.  *See* SSR 96-8p ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence (e.g., daily activities, observations).").  As it stands, the Court is unable to discern what line of reasoning led the ALJ to assess the post-July 2012 physical RFC.  That requires remand.  *See Norris v. Astrue*, 776 F. Supp.2d 616, 637 (N.D. Ill. 2011) ("The ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis.").

The same problems apply to the ALJ's mental RFC.  Despite his finding that Plaintiff's mental condition did not deteriorate after July 2012, the ALJ altered the mental

RFC after that date and found that Plaintiff was less restricted than before. The ALJ said that prior to July 2012 Plaintiff would need to be off task up to five percent of the time, but he eliminated that restriction in the second mental RFC. However, the ALJ neither explained what it was in the record that supported such a change nor gave any indication of how he went about assessing either of Plaintiff's mental RFCs. The ALJ could not have relied on the mental RFC issued by state-agency expert Dr. Donald Henson because the ALJ only gave it "some" weight. (R. 27). Dr. Levitan's concerns about Plaintiff's ability to handle the stresses of regular work were not considered because the ALJ erroneously concluded that Dr. Levitan's report was tainted by Plaintiff's alleged use of Xanax. Dr. Reinstein's mental RFC was dismissed out of hand, and Dr. Friedman's RFC was not properly considered for the reasons discussed above. Since an RFC assessment is a legal instead of a medical conclusion, an ALJ is entitled to assess a claimant's RFC without an expert's guidance when the record is sufficient to do so and when the ALJ adequately explains the basis of his reasoning.FDAS Instead of doing so, the ALJ improperly accepted and rejected parts of Dr. Friedman's findings and cobbled together a mental RFC that depended on the unexplained premise that Plaintiff's alcohol and Xanax use was at the heart of his mental problems and that he could function adequately in the workplace if he would only comply with treatment. That requires remand so that the ALJ can explain the basis of his reasoning on this issue more carefully. *See Bailey v. Barnhart*, 473 F. Supp.2d 822, 839 (N.D. Ill. 2006) ("Having rejected the available medical record upon which to base an RFC assessment, the ALJ was then required to call a medical advisor and/or obtain clarification of the record to flesh out what she needed to support her decision."); *Harper v. Berryhill*, No.

16 C 5075, 2017 WL 1208443, at *8 (N.D. Ill. April 3, 2017) ("Having rejected the only RFC[s] in the record, and without a medical expert to clarify matters, the ALJ was obligated to explain more carefully how the evidence supported his RFC assessment.").

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [11] is granted.  Pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER: 7/10/2017

_____
Susan E. Cox
United States Magistrate Judge